1

2

3

4

5

6

7               IN THE UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10

11  LUIS VALENZUELA RODRIGUEZ,

12              Plaintiff,               No. 2:08-cv-1028 GEB AC P

13       vs.

14
     JAMES TILTON, _et al._,            ORDER AND
15
              Defendants.               FINDINGS & RECOMMENDATIONS
16  _____/

17              Plaintiff is a prisoner proceeding pro se and in forma pauperis with a civil rights

18  action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendant Dr. Dena Anthony's

19  October 23, 2012 motion for summary judgment.  Plaintiff opposes the motion.  On review of

20  the motion, the documents filed in support and opposition, and good cause appearing therefor,

21  THE COURT FINDS AS FOLLOWS:

22                          FACTUAL ALLEGATIONS

23              In the operative third amended complaint ("TAC"), plaintiff sets forth a number

24  of allegations directed at multiple defendants and spanning a period of three years.  As to those

25  allegations that are not directed to the moving defendant, the court notes only that, beginning in

26  August 28, 2006, plaintiff complained to staff at Mule Creek State Prison ("MCSP"), where he

1

was incarcerated at all times relevant to this motion[1], of increasing pain and paralysis in his upper body.  Despite repeated complaints, plaintiff was not seen by a doctor until September 5, 2006, when he was diagnosed with a life-threatening bacterial infection in his blood that created an epidural abscess along his lower spine and spinal cord.  Plaintiff was immediately transferred to a hospital where he underwent emergency surgery.  As a result of this infection, plaintiff suffered pain and a permanent loss of his ability to control his urinary and bowel functions.

Following two months of rehabilitation at Kentfield Hospital in Kentfield, California, plaintiff returned to MCSP where he was temporarily housed in Administrative Segregation ("Ad-Seg") before being housed in a second-tier cell.  Plaintiff accuses MCSP staff members of violating his Eighth Amendment rights by failing to provide adequate and timely medical care and treatment.  Plaintiff also accuses MCSP staff members of retaliating against him for filing grievances.  By way of relief, plaintiff seeks compensatory, nominal, and punitive damages.

Plaintiff's allegations as to the moving defendant, Dr. Anthony, are limited to three paragraphs in the 55-page pleading and are reproduced here in their entirety:

> Plaintiff had submitted requests for urgent mental health intervention, and had fully explained to the mental health clinician the horrors and traumatizing experiences he had continued to be forced to endure, and that he could no longer tolerate being forced to double cell, and that such was causing him suicidal ideations and extreme depression, but the mental health clinician (clinical social worker) Anthony, refused to help plaintiff and instead her and Dr. Powell falsified malicious information into plaintiff's mental health file to claim that plaintiff had a history of 'exaggerating symptoms.'

TAC ¶ 136.

> Plaintiff's continued attempts to acquire mental health care and needed intensive support therapy and requests to be placed into Enhanced Outpatient Program was rejected by mental health clinician 'Anthony' with false asser5tions [sic] documented by Anthony and Psycholgist [sic] Powell, claiming plaintiff had a history of 'exaggerating symptoms", yet plaintiff was going

---

[1] Plaintiff is now housed at Salinas Valley State Prison in Soledad, California.

2

through horrendous traumas physically and mentally, and denied meaningful therapy/support.

TAC ¶ 155.

> Plaintiff asserts that defendants POWELL and ANTHONY, intentionally and deliberately exercised deliberate indifference and or wanton and or reckless disregard for plaintiff's extensive mental health conditions and needs upon plaintiff's return from Kentfield Rehabilitation Hospital, despite plaintiff's emphatically stated needs for help with his extremely exacerbated depression and suicidal ideations which continued all day every day as a direct result of the extensive and extremely horrendous traumas and extreme physical / medical and extreme life altering injuries, losses and disabilities plaintiff had continued to be forced to contend with, as described herein supra, . . . . Plaintiff's suicide ideations manifested in a plan to 'overdose' himself with illegal narcotics obtained on the prison yard, due to the extensive and horrendous physical, mental and emotional sufferings plaintiff continued to be forced to endure (supra) alone and without help from anyone within the prison, regardless of his requests.  Plaintiff was seen a total of once or twice by ANTHONY for a period of fifteen minutes each time, and once or twice by Powell during mental health classification process which only lasted for a couple of minutes.  Plaintiff believes he should have been promptly designated "Enhanced Outpatient Program" (E.O.P.) Inamte [sic] and provided the daily intensive daily [sic] mental health care treatment provided the E.O.P. inmates, as plaintiff was eventually designated E.O.P. in about April or May 2008.  Plaintiff had great difficulties just trying to think clearly and to think straght [sic], through the periods of short term memory losses and the extreme depression / anxieties / hopelessness / helplessness and his inabilities to physically and mentally adequately function among other inmates and in the general population program.  Plaintiff's mental health problems continue to present date due to, inter alia, all the foregoing reasons.

TAC at 50.

FACTS[2]

At all times relevant to this action, plaintiff was a state prisoner housed at MCSP.

Defendant Dr. Anthony was a psychologist licensed by the State of California and working as an

independent contractor at MCSP.  Anthony Decl., ECF No. 127-2, ¶ 2.  At MCSP, Dr. Anthony

---

[2]  All facts are undisputed unless noted otherwise.

1  worked as a "Case Manager" and provided mental health services three days per week.  Id.  In

2  performing her duties at MCSP, Dr. Anthony worked alongside a team of health care

3  practitioners called an Interdisciplinary Treatment Team ("IDTT") that provided joint

4  evaluations and decisions concerning inmates' health.  Id.

5  A.      Mental Health Care Before September 2006 Bacterial Infection

6          Plaintiff met with MCSP mental health staff multiple times before his September

7  2006 bacterial infection.  Plaintiff's records document the following interactions with mental

8  health staff.

9          On May 4, 2006, plaintiff was seen by three members of the mental health team

10 for a treatment plan update.  The team members in attendance were clinical social worker Chuck

11 Christensen, Dr. K. Cornish, and Dr. Lipon.[3]  Pl.'s Decl., Ex. 6 (ECF No. 144-1 at 41).  Dr.

12 Anthony was not present at this meeting.  See id.  Based on the meeting notes, plaintiff's

13 problems were identified as anxiety and depression, for which he had been prescribed an anti-

14 depressant.  Id.

15         On July 27, 2006, plaintiff met with ten members of the IDTT following his

16 placement in Ad-Seg for stabbing another inmate.  See Pl.'s Decl., Ex. 6 (ECF No. 144-1 at 46).

17 Dr. Anthony was not present at this evaluation.  Id.  The notes of this meeting reference

18 plaintiff's anxiety and depression, note his prescription for an anti-depressant, and reflect that his

19 suicide risk assessment was "None to minimal."  Id.  He was diagnosed with Axis I mood

20 disorder, anxiety disorder, post-traumatic stress syndrome, and polysubstance dependence.  Id.

21 He was also diagnosed with an Axis II personality disorder.  Id.  Finally, he was diagnosed with

22 Axis IV stressors, including prison, LWOP ("Life Without Parole"), and Ad-Seg.  Id.[4]

23

24     [3] Of the MCSP mental health staff members identified herein, only Dr. Anthony and Dr.
   Powell are named in the TAC.

25

26     [4] The DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, 4th edition
                                                                              (continued...)

                                              4

1    On August 22, 2006, plaintiff met with Dr. Douglas Lish in a one-on-one

2 meeting. Pl.'s Decl., Ex. 7 (ECF No. 144-1 at 50). The notes of this meeting reflect that

3 plaintiff was "very frustrated and anxious over double-cell status." Id. Plaintiff requested

4 single-cell status, even if it was temporary, because he was suspicious of his cellmate. Id.

5 Plaintiff denied any suicidal ideations. Id. His mood was noted to be anxious with some

6 depression. Id.

7    On August 24, 2006, plaintiff was seen by five members of the IDTT, including

8 Dr. Anthony and Dr. Powell, purportedly the IDTT supervisor. Pl.'s Decl., Ex. 5 (ECF No. 144-

9 1 at 41). The notes of this meeting, which were prepared by clinical psychologist Dr. Keller,

10 reflect that plaintiff's suicide risk was deemed "None," that he was complaining of depression

11 and anxiety, and that he was suspicious of his cellmate. Id. Dr. Keller also wrote that plaintiff

12 "is highly manipulative" and that "no single cell [is] indicated." Id. (emphasis in original).

13 Additional therapy was not deemed clinically necessary. Id.

14 B.    Mental Health Care After September 2006 Bacterial Infection

15    Following plaintiff's September 5, 2006 bacterial infection and return from

16 Kentfield Hospital, plaintiff was seen by MCSP mental health professionals regularly.

17    On November 22, 2006, plaintiff was seen in a one-on-one meeting with

18 psychiatrist Dr. Young. Pl.'s Decl., Ex. 7 (ECF No. 144-1 at 51). After referencing plaintiff's

19 medical issues related to the bacterial infection, Dr. Young wrote that plaintiff was calm and

20 cooperative and that he had a "mild" depressive mood. Id.

21    On November 30, 2006, plaintiff was seen by three members of the IDTT,

22

23    [4](...continued)
(1994)) establishes a multi-axial framework for mental health assessment. Axis I refers broadly
24 to the principal psychiatric disorder(s) that require treatment. Axis II lists any co-occurring
personality or developmental disorders. Axis III lists any medical or neurological problems that
25 may be relevant to the individual's mental health history. Axis IV identifies psychosocial
stressors facing the individual. Axis V identifies the individual's "level of function" at the time
26 of assessment.

including Dr. Anthony.  Pl.'s Decl., Ex. 6 (ECF No. 44-1 at 47).  Per Dr. Anthony's notes of this

meeting, plaintiff was diagnosed with an Axis I unspecified adjustment disorder that was in

partial remission, as well as an Axis II personality disorder with narcissistic features.  Id.;

Anthony Decl., ECF No. 127-2, ¶ 4.  The IDTT determined that plaintiff met the inclusion for

mental health treatment in the Correctional Clinical Case Management Program ("CCCMS") at

MCSP.  Pl.'s Decl., Ex. 6 (ECF No. 144-1 at 47).  The notes also indicate that plaintiff's current

suicide risk was "None," that he could be placed in both a single or double cell, and that he was

recovering from surgery.  Id.

Plaintiff was next seen on January 26, 2007 in a one-on-one meeting with Dr.

Anthony.  Pl.'s Decl., Ex. 5 (ECF No. 144-1 at 42).  Per Dr. Anthony's notes, plaintiff was again

diagnosed with an unspecified adjustment disorder that was in partial remission.  Id.  Plaintiff's

suicide risk was deemed "Minimal," and it was noted that there were no episodes of self harm or

suicidal ideation.  Id.  There were also no episodes of violence to others, and plaintiff's violence

risk was also deemed "Minimal."  Id.  The notes reflect that plaintiff was not taking any

psychiatric medication, his mood was listed as "Euthymia,"[5] and he had no problems with sleep

or appetite.  Id.  Although plaintiff felt that he had been mistreated by the system and asked for

therapy for the resulting depression, Dr. Anthony did not deem it necessary to continue plaintiff

in CCCMS any longer.  Id.

On January 30, 2007, plaintiff was again seen by psychiatrist Dr. Young in a one-

on-one meeting.  Pl.'s Decl., Ex. 8 (ECF No. 144-1 at 53).  Dr. Young's notes reflect that

plaintiff was calm and cooperative, that he denied suicidal ideations, that he was not anxious or

depressed, and that he was fairly content because he had recently  been placed in a single cell on

a lower tier.  Id.  Dr. Young discussed relaxation techniques with plaintiff, and noted that his

intermittent withdrawal from medication likely resulted in some anxiety.  Id.

---

[5]  "Euthymia" is defined as "a pleasant relaxed state of tranquility" and a "stable mood."
Mosby's Medical Dictionary (8th ed. 2009).

1          On February 7, 2007, plaintiff was seen by social worker K. Towner for forty-five

2   minutes.  Pl.'s Decl., Ex. 9 (ECF No. 144-1 at 57).  At this meeting, Towner noted that plaintiff

3   was anxious and depressed, though Towner considered the depression to be "situational."  Id.

4   Towner also indicated that plaintiff was having trouble sleeping ("delayed onset" and "frequent

5   waking"), but his appetite was "good" and he denied any suicidality.  Id.  According to these

6   notes, plaintiff was housed in Ad-Seg "for possession of 3 razor blades, 2 sewing needles, & 2

7   lead pencils hidden in his back brace.  Asked why in adseg, [plaintiff] launched into a long (20

8   minutes) circumstantial explanation of recent stressful events, culminating in poss. of

9   contraband."[6]  Id. (emphasis in original).

10         On February 26, 2007, plaintiff was seen by Dr. Gasparo for a "meds eval."  Pl.'s

11  Decl., Ex. 8 (ECF No. 144-1 at 55).  These notes were taken after plaintiff was released from

12  Ad-Seg and while he was waiting for a single cell.  Id.  Per Dr. Gasparo's notes, plaintiff had

13  been seen for mental health at MCSP mainly for Axis II issues and he was not currently on any

14  medication.  Id.  Plaintiff was noted to complain of depression and anxiety, but he denied

15  suicidal ideations or violent tendencies.  Id.  Plaintiff was also noted to be talkative with no

16  outward signs of distress or psychosis.  Id.

17         On March 8, 2007, plaintiff was seen by five members of the IDTT, including Dr.

18  Anthony.  Pl.'s Decl., Ex. 5 (ECF No. 144-1 at 43); Anthony Decl., ECF No. 127-2, ¶ 6.  The

19  notes of this meeting, which were prepared by Dr. Anthony, reflect that plaintiff was diagnosed

20  with adjustment disorder with mixed disturbance of mood and conduct, polysubstance

21  dependence, and anti-social personality disorder.  Pl.'s Decl., Ex. 5 (ECF No. 144-1 at 43).

22  Although plaintiff was not deemed a suicide risk, he was noted to be taking medication and was

23  having problems sleeping.  Id.  According to his symptom list and the experiences of the IDTT

24  members, plaintiff was determined to have a history of exaggerating his symptoms for secondary

25

26         [6] It appears Towner's notes continued onto a second page, but the second page has not
    been provided to the court.  See Pl's Decl., Ex. 9 (ECF No. 144-1 at 57).

1    gain.  Id.  The IDTT also determined that additional therapy was unnecessary and that plaintiff

2    was not suitable for group treatment due to charges that involved safety issues with supplies.  Id.

3    Plaintiff was deemed "historically a program failure."  Id.; Anthony Decl., ECF No. 127-2, Ex.

4    K.

5                 On April 25, 2007, plaintiff was seen by Dr. Anthony in a one-on-one meeting.

6    Pl.'s Decl., Ex. 10 (ECF No. 144-1 at 60).  Per Dr. Anthony's notes, plaintiff was diagnosed with

7    disturbances of mood and conduct.  Id.  His suicide and violence risk was deemed "Minimal,"

8    and there were no noted episodes of self harm, suicidal ideation, or violence to others.  Id.

9    Although plaintiff expressed "dread of life in prison" and "dread of dying," Dr. Anthony

10   believed that additional treatment was "inappropriate due to safety issues."  Id.

11                Finally, on May 9, 2007, plaintiff met with Dr. Abrams in a one-on-one meeting.

12   Pl.'s Decl., Ex. 9 (ECF No. 144-1 at 56).  Per Dr. Abrams's notes, plaintiff said "I'm doing

13   good," despite his placement in Ad-Seg on May 5, 2007 for possession of controlled substances.

14   Id.  After plaintiff told Dr. Abrams about his spinal surgery and the impact on his bowel and

15   bladder control, Dr. Abrams wrote: "Just as I was about to write a mental status exam with him

16   as cooperative and positive in attitude.  Suddenly he affected a hushed serious 'sincere' tone and

17   a spiel about having a hard time, 'I've been seriously wondering... (seriously wondering what?) I

18   need some help dealing . . .' then alludes to his general prison situation, being in ASU, etc."  Id.

19   Dr. Abrams diagnosed plaintiff with a polysubstance abuse disorder.  Id.

20   C.    Plaintiff's Declaration

21                In his declaration submitted in opposition to summary judgement, plaintiff

22   contends in general terms that the mental health treatment records summarized above are

23   incomplete in that they do not document his reports of feeling suicidal.  He also contends that the

24   treatment notes contain false information, referring primarily to assessments that plaintiff was

25   not suicidal and that he is manipulative.

26                Plaintiff's declaration states that he experienced "obsessive suicidal thoughts"

1   beginning in November 2006.  Pl.'s Decl., ECF No. 141-1, ¶ 6.  At an unspecified time or times,

2   plaintiff directly informed defendant Anthony that he continued to have obsessive thoughts of

3   suicide "as possibly the only meaningful full solution and resolution to the continued

4   'horrendous' retaliatory malicious malfeasance by officers and medical personnel, and the

5   continued extensive depression and extensive continued medical problems and disabilities. . ."

6   Id. at ¶ 9.   He told Anthony of his thoughts of suicide at some unspecified point before

7   preparing to kill himself with razor blades on February 5, 2007.  Id. at ¶ 34.  He was caught with

8   the razor blades and therefore did not kill himself.  Id.  Sometime between March and May of

9   2007, plaintiff specifically told Anthony that he was seriously considering buying a large dose of

10  heroin on the prison yard so that he could take a fatal overdose.  Id. at ¶ 17.  Plaintiff actively

11  planned and prepared to commit suicide on May 5, 2007, and had obtained narcotics for that

12  purpose, but was caught with the contraband.  His suicide plan was foiled by being put in lock-

13  up.  Id. at ¶ 20.

14          Plaintiff's declaration directly contradicts that of defendant Anthony , who states:

15  "At no time do I recall Mr. Rodriguez telling me he planned to overdose on illegal narcotics or

16  wanted to kill himself."  Anthony Decl., ECF No. 127-2, ¶ 10.

17                          RELEVANT PROCEDURAL BACKGROUND

18          Plaintiff initiated this action on May 12, 2008.  Although plaintiff named a

19  number of individuals in that pleading, he did not name Dr. Anthony.  On May 28, 2008, this

20  court screened the complaint with leave to file an amended complaint.

21          On October 7, 2008, plaintiff filed a first amended complaint ("FAC"), this time

22  naming Dr. Anthony.  ECF No. 8.  By order filed October 6, 2009, the court screened the FAC

23  and dismissed plaintiff's claim against Dr. Anthony for failure to state specific allegations.  The

24  court did not specify whether the dismissal was with prejudice or with leave to amend.

25          On January 29, 2010, plaintiff filed a second amended complaint ("SAC").  ECF

26  No. 13.  Plaintiff, however, did not name Dr. Anthony in this pleading.  On February 23, 2010,

9

1   the court screened the SAC and found service proper for a number of defendants.

2          On August 20, 2010, plaintiff filed a motion to amend and attached a copy of the

3   operative TAC.  ECF No. 32.  In this proposed TAC, plaintiff again named Dr. Anthony and set

4   forth charging allegations as to her.  The court granted plaintiff's motion to amend, screened the

5   TAC, and found service proper for, inter alia, Dr. Anthony.

6          On October 18, 2011, Dr. Anthony filed an answer.  ECF No. 98.  On October 23,

7   2012, Dr. Anthony filed a motion for summary judgment.

8                                    LEGAL STANDARDS

9          Summary judgment is appropriate when it is demonstrated that there exists "no

10  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

11  law."  Fed. R. Civ. P. 56(a).

12             Under summary judgment practice, the moving party always
               bears the initial responsibility of informing the district court of the
13             basis for its motion, and identifying those portions of "the
               pleadings, depositions, answers to interrogatories, and admissions
14             on file, together with the affidavits, if any," which it believes
               demonstrate the absence of a genuine issue of material fact.
15

16  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

17  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

18  judgment motion may properly be made in reliance solely on the 'pleadings, depositions,

19  answers to interrogatories, and admissions on file.'"  Id. at 324.  Indeed, summary judgment

20  should be entered, after adequate time for discovery and upon motion, against a party who fails

21  to make a showing sufficient to establish the existence of an element essential to that party's

22  case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete

23  failure of proof concerning an essential element of the nonmoving party's case necessarily

24  renders all other facts immaterial."  Id. at 323.  In such a circumstance, summary judgment

25  should be granted, "so long as whatever is before the district court demonstrates that the standard

26  for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

1    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

2    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

3    1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

4    show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

5    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6    'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

7            In applying these rules, district courts must "construe liberally motion papers and

8    pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly."

9    Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

10                                    DISCUSSION

11   A.    Res Judicata

12           Defendant first argues that plaintiff's allegations as to her are barred by res

13   judicata because the court's prior screening order dismissed her from suit.  Plaintiff counters that

14   the order dismissing Dr. Anthony did not do so with prejudice.  For the reasons set forth below,

15   defendant is not entitled to summary judgment on this ground.

16           The doctrine of res judicata, or claim preclusion, provides that a final judgment

17   on the merits bars further claims by the parties or their privies based on the same cause of action.

18   Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 322 F.3d 1064, 1077 (9th Cir.

19   2003).  It prohibits the re-litigation of any claims that were raised or could have been raised in a

20   prior action.  Western Radio Servs. Co., Inc. v. Glickman, 123 F.3d 1189, 1192 (9th Cir. 1997).

21   It is immaterial whether the claims asserted subsequent to the judgment were actually pursued in

22   the action that led to the judgment; rather, the relevant inquiry is whether they could have been

23   brought.  Tahoe-Sierra Pres. Council, 322 F.3d at 1078.  The purpose of the doctrine is to

24   "relieve parties of the cost and vexation of multiple law suits, conserve judicial resources, and,

25   by preventing inconsistent decisions, encourage reliance on adjudication."  Marin v. HEW,

26   Health Care Fin. Agency, 769 F.2d 590, 594 (9th Cir. 1985) (quoting Allen v. McCurry, 449

U.S. 90, 94 (1980)).  Three elements must be present in order for res judicata to be applicable: (1) an identity of claims; (2) a final judgment on the merits; and (3) the same parties or privity between the parties.  Id.

The doctrine of res judicata is inapplicable here because there does not exist a final judgment on the merits in a *separate* action.  Rather, the order that defendant relies on is an order issued in *this* case.  At best, defendant seeks judgment pursuant to the law of the case doctrine.  The law of the case doctrine is "an imminently practical rule[.]"  Casumpang v. Int'l Longshoremen's & Warehousemen's Union, Local 142, 297 F. Supp. 2d 1238, 1249 (D. Haw. 2003).  It is a doctrine of "a judicial invention designed to aid in the efficient operation of court affairs."  U.S. v. Lummi Indian, 235 F.3d 443, 452 (9th Cir. 2000) (citation and internal quotation marks omitted).  "[T]he law of the case doctrine ensures the finality of legal issues decided in an earlier proceeding in the same suit."  Orantes–Hernandez v. Gonzales, 504 F. Supp. 2d 825, 836 (C.D. Cal. 2007) (citing Arizona v. California, 460 U.S. 605, 619 (1983)).  Avoiding "reconsideration of questions previously decided . . . during the course of a single case" promotes and maintains "consistency[.]"  United States v. Mills, 810 F.2d 907, 909 (9th Cir. 1987) (citation omitted).  Accordingly, the law of the case doctrine "ordinarily precludes a court from reexamining an issue previously decided by the same court or a higher court in the same case."  Southern Oregon Barter Fair. v. Jackson County, 372 F.3d 1128, 1136 (9th Cir. 2004) (citation omitted).

In this case, defendant argues that the court's October 6, 2009 screening order dismissed plaintiff's claims against her and therefore any future claims brought against her have been barred.  This argument relies on an unsupported reading of the court's screening order.  There, the court merely held that plaintiff's allegations against Dr. Anthony in the FAC failed to state a claim.  The court did not dismiss, as defendant suggests, plaintiff's claims with prejudice or without leave to amend.  Defendant's reading of the screening order is further undermined by the court's subsequent order granting plaintiff leave to amend to state a claim against Dr.

13

1   Anthony.  Accordingly, defendant is not entitled to summary judgment on this ground.

2   B.      Eighth Amendment

3           Defendant next seeks summary judgment on the ground that plaintiff has failed to

4   establish a violation of his Eighth Amendment rights.  The court agrees.

5           Deliberate indifference to a prisoner's serious medical needs violates the Eighth

6   Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429

7   U.S. 97, 102-04 (1975).  Prisoners' mental health needs are among the medical needs covered by

8   the Eighth Amendment.  See Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994); see

9   also Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982) (mental health care requirements

10  analyzed as part of general health care requirements), abrogated in part on other grounds by

11  Sandin v. Connor, 515 U.S. 472 (1995).

12          "In the Ninth Circuit, the test for deliberate indifference consists of two parts.

13  First, the plaintiff must show a serious medical need by demonstrating that failure to treat a

14  prisoner's condition could result in further significant injury or the unnecessary and wanton

15  infliction of pain.  Second, the plaintiff must show the defendant's response to the need was

16  deliberately indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or

17  failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

18  indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations,

19  punctuation and quotation marks omitted).

20      1.      Part One: Mental Health Need

21          A serious mental health need, like any serious medical need, exists

22          if the failure to treat a prisoner's condition could result in further
            significant injury or the "unnecessary and wanton infliction of
23          pain."  The "routine discomfort" that results from incarceration
            and which is "part of the penalty that criminal offenders pay for
24          their offenses against society" does not constitute a "serious"
            medical need.
25

26  Doty, 37 F.3d at 546 (citations omitted).

                                            14

1    It is questionable whether plaintiff can meet this standard.  His prison mental

2   health records do not reflect a psychiatric diagnosis that is consistent with a serious mental

3   health need.  Although plaintiff claims he suffered from severe depression and anxiety, the

4   record reflects consistent professional opinions that his anxiety and other mood issues were not

5   clinically serious.  He presents no contrary expert opinion.  See United States v. Kidder, 869

6   F.2d 1328, 1331, n.2 (9th Cir. 1989) (affidavit from psychiatrist that inmate suffers from post

7   traumatic stress disorder, and a showing of serious impairment of ability to function or serious

8   threat of self-harm, sufficient to establish a serious mental disorder).

9    Plaintiff argues that he has been unable to submit an expert opinion because he

10   has no means of securing one.  Plaintiff asks the court to appoint an expert witness "to provide

11   plaintiff with his needed supporting Expert witness affidavit / testimony."  Opp'n at 20.

12   Pursuant to Federal Rule of Evidence 702, an expert witness may testify to help the trier of fact

13   determine the evidence or a fact at issue.  A court has full discretion to appoint an expert witness

14   either by its own motion or by a party's motion.  Fed. R. Evid. 706(a); McKinney v. Anderson,

15   924 F.2d 1500, 1510-11 (9th Cir. 1991), overruled on other grounds by Helling v. McKinney,

16   502 U.S. 903 (1991).  Appointment of an expert witness may generally be appropriate when

17   "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the

18   evidence or decide a fact in issue. . . ."  Levi v. Dir. of Corr., 2006 WL 845733, at *2 (E.D. Cal.

19   2006) (citation omitted).  Here, however, plaintiff seeks the appointment of an expert to help him

20   present his case.  "Reasonably construed, [Rule 706] does not contemplate the appointment of,

21   and compensation for, an expert to aid one of the parties."  Trimble v. City of Phoenix Police

22   Dept. 2006 WL 778697, at *6 (D. Ariz. 2006) (citation omitted).  Accordingly, this request

23   should be denied.[7]

24

25    [7] In his opposition, plaintiff also asserts that he has been unable to present evidence
    because defendant failed to adequately respond to his discovery requests. The docket in this case

26    (continued...)

1          The undersigned is well aware, on the other hand, that an unrepresented and

2    indigent prisoner does not have access to expert services.  Here plaintiff is essentially dependent

3    on defendants – the same defendants he accuses of failing to document and treat his mental

4    illness – for documentation of his condition.  Accordingly, this court will not recommend a

5    ruling against petitioner on the ground that he cannot produce an expert opinion corroborating

6    his own version of his mental state.  However, plaintiff also fails to produce non-expert witness

7    affidavits or other direct or circumstantial evidence of his symptoms, behavior, affect or

8    purported statements to staff regarding suicidal thoughts.  That omission is relevant to the

9    summary judgment analysis, because it is plaintiff's burden to demonstrate the existence of

10   evidence sufficient to proceed.  See Celotex, 477 U.S. at 322 (a complete failure of proof

11   concerning an essential element of the non-moving party's case renders all other facts

12   immaterial).

13         Regardless of the existence vel non of an underlying psychiatric diagnosis,

14   however, suicidal ideation itself unquestionably constitutes a mental health emergency and a

15   serious medical need.  Plaintiff's declaration, submitted under penalty of perjury, states that he

16   planned suicide on two occasions in February and May of 2007, and actively contemplated

17   suicide over a period of many months.  This declaration is inconsistent with the unanimous

18   clinical impressions of numerous mental health professionals.  As to the February 2007 suicide

19   attempt, plaintiff's declaration also contradicts the TAC itself.[8]  Nonetheless, courts generally

20   _____

21         [7](...continued)
     reveals that plaintiff filed only one timely motion to compel directed to this issue, which was
22   denied for plaintiff's failure to specify the grounds on which he sought relief.  See ECF No. 97.
     Although plaintiff later filed additional motions to compel, each of these were denied as
23   untimely, having been filed after the discovery deadline.  See ECF Nos. 122, 152.  Thus,
     plaintiff's failure to submit evidence is directly attributable to own his failure to file a timely and
24   adequate motion to compel.

25         [8] Plaintiff's declaration states that he possessed razor blades for the purpose of
     committing suicide.  In the TAC, plaintiff provided an entirely different explanation for the razor
26                                                                        (continued...)

may not make credibility determinations on a motion for summary judgment.  See Earp v. Ornoski, 431 F.3d 1158, 1170 (9th Cir. 2005) (court should not determine credibility of affiants on summary judgment), cert. denied, 547 U.S. 1159 (2006); see also United States v. Two Tracts of Land in Cascade County, Mont., 5 F.3d 1360, 1362 (9th Cir. 1993) (reversing and remanding summary judgment for live testimony where the district court concluded on the basis of affidavits that the affiants were not credible).  This is not an absolute rule.  For example, a party's inconsistent or implausible testimony will not necessarily defeat summary judgment.

---

[8](...continued)
blades.  There, plaintiff expressed his dissatisfaction with being double-celled upon his return from Kentfield Hospital.  See TAC ¶¶ 122-23, 135.  Intent on longer double-celling, plaintiff planned to tell MCSP staff that he refused to accept a cellmate "and was willing if necessary to go to lock-up, as he had been driven to that extreme point of being unable to physically and psychologically handle that kind of double celling situation."  TAC ¶ 135.  It is in this context that plaintiff discusses razor blades:

> Plaintiff next prepared to go to lock-up and placed two sewing needles, two pencil leads and three razor blades into his back brace, *for purposes of cutting his diapers to fit comfortably* (which he had previously documented in a 602 complaint was necessary as they continued to give plaintiff very large diapers that didn't fit comfortably as they were very large and excessively bulky), *as well as to alter clothing* for purposes of whearing [sic] a large piece of the diaper as a pad to allow a little comfort while in the cell and not moving about.

TAC ¶ 137 (emphasis added).

When plaintiff then informed a staff officer that he did not want to double-cell any longer, the officer did not place plaintiff in Ad-Seg as plaintiff expected but instead placed him in a single cell.  At this point, plaintiff "completely forgot about the items (supra) which he had placed into his back brace in preparations if he were to go to lock-up (supra)."  Id. ¶ 140.  On February 5, 2007, plaintiff was placed in Ad-Seg after these items, including the razor blades, were confiscated.  While there, plaintiff met with social worker Towner for a mental health weekly assessment.  See Pl.'s Decl., Ex. 9 (ECF No. 144-1 at 55).  During this February 7, 2007 assessment, Towner's notes reflect that plaintiff was placed in Ad-Seg "for possession of 3 razor blades, 2 sewing needles, & 2 lead pencils hidden in his back brace. . . ," and that he denied any suicidality.  See id.

Thus, based on plaintiff's own verified statements, he intended to use the razor blades to alter diapers and clothing, not to commit suicide.  Plaintiff may not now create a triable issue of material fact by contradicting his own verified statements.  See Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991) (holding that party cannot create issue of material fact with an affidavit contradicting the party's own prior deposition testimony).

1  Anderson, 477 U.S. at 256-57.  This court need not decide whether plaintiff's declaration

2  suffices to defeat summary judgment on the question of serious medical need, because the

3  deliberate indifference issue is dispositive for the reasons explained below.  For purposes of the

4  present motion, therefore, the court will assume without deciding that there exists a triable issue

5  of fact regarding the existence of a serious medical need.

6        2.    Part Two: Deliberate Indifference

7        To establish deliberate indifference to his serious mental health needs, plaintiff

8  must show that Dr. Anthony both knew of, and disregarded, an excessive risk to his health or

9  safety.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

> The question . . . whether a defendant charged with violating rights
> protected by the Eighth Amendment has the requisite knowledge is
> "a question of fact subject to demonstration in the usual ways,
> including inference from circumstantial evidence [citation
> omitted], and a factfinder may conclude that a prison official knew
> of a substantial risk from the very fact that the risk was obvious."
> [Farmer] at114 S. Ct. at 1981.  The inference of knowledge from
> an obvious risk has been described by the Supreme Court as a
> rebuttable presumption, and thus prison officials bear the burden of
> proving ignorance of an obvious risk.  [Id.] at 1982.  It is also
> established that defendants cannot escape liability by virtue of
> their having turned a blind eye to facts or inferences "strongly
> suspected to be true."  [Id.] at 1982 n.8, and that "[i]f . . . the
> evidence before the district court establishes that an inmate faces
> an objectively intolerable risk of serious injury, the defendants
> could not plausibly persist in claiming lack of awareness."  [Id.] at
> 1984 n.9.

19  Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995).

20        Prisons officials defending a deliberate indifference claim may avoid liability by

21  demonstrating "that they did not know of the underlying facts indicating a sufficiently

22  substantial danger and that they were therefore unaware of a danger, or that they knew the

23  underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was

24  insubstantial or nonexistent."  Farmer, 511 U.S. at 844.  Thus, a prison official may avoid

25  liability by presenting evidence that he lacked knowledge of the risk and/or that his response was

26  reasonable in light of all the circumstances.  Id. at 844-45; see also Wilson v. Seiter, 501 U.S.

1 | 294, 298 (1991); <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

2 |      In the TAC, plaintiff alleges that Dr. Anthony failed to place him in the Enhanced

3 | Outpatient Treatment Program ("EEOP") despite awareness of plaintiff's suicidal ideations.

4 | Plaintiff also accuses Dr. Anthony of conspiring with Dr. Powell to retaliate against plaintiff by

5 | downplaying his mental health needs and accusing him of exaggerating his symptoms in

6 | response to plaintiff's filing of complaints against MCSP staff.  As a result of Dr. Anthony's

7 | conduct, plaintiff twice prepared to attempt suicide.

8 |      In her motion for summary judgment, Dr. Anthony asserts that she was unaware

9 | of a mental health need that would have required any care beyond what she provided.  In

10 | support, Dr. Anthony relies on the record, which evidences that plaintiff was seen by Dr.

11 | Anthony on four occasions, two with other members of the IDTT and two one-on-one meetings.

12 | According to the notes of these meetings, at no time did plaintiff express or exhibit suicidal

13 | ideations.

14 |      Dr. Anthony also declares that at no time during any of her visits with plaintiff

15 | did she believe that plaintiff's mental condition was sufficiently severe to render him an

16 | appropriate candidate for EEOP.  Anthony Decl. ¶ 7.  Instead, Dr. Anthony believed that

17 | plaintiff's primary problem was extreme anger.  <u>Id.</u>  Dr. Anthony does not recall plaintiff telling

18 | her that he planned to overdose on illegal narcotics or wanted to kill himself, and she did not

19 | observe plaintiff to be suffering from either horrendous physical or mental trauma.  <u>Id.</u> ¶¶ 10-11.

20 | Finally, at no time during the period when she evaluated plaintiff did she observe him to display

21 | any signs of suicidal ideation.  <u>Id.</u> ¶ 12.

22 |      In an attempt to show that Dr. Anthony knew of and disregarded an excessive risk

23 | to his mental health, plaintiff declares that he informed Dr. Anthony both in writing and verbally

24 | of his suicidal ideations and need for treatment.  <u>See</u>, <u>e.g.</u>, Pl.'s Decl. ¶ 2 (ECF No. 144-1).

25 | Plaintiff submits no written record of his requests for mental health care.

26 |      As to his verbal statements, plaintiff declares that he informed Dr. Anthony and

1  "anyone and everyone [he] came into meaningful contact with" of his "obsessive suicidal

2  thoughts." Pl.'s Decl. ¶ 6 (ECF No. 144-1 at 3).  Plaintiff again submits no evidence, affidavits

3  or otherwise, in support.  Plaintiff does state that "around the period of time between March

4  2007 thru May 2007," he informed Dr. Anthony of his intent to overdose with heroin.  Pl.'s

5  Decl. ¶ 17 (ECF No. 144-1 at 5-6).  During this period, plaintiff met with Dr. Anthony twice,

6  first in a group setting with five other IDTT members and then in a one-on-one meeting.

7  Plaintiff, however, fails to specify during which of these meetings he told Dr. Anthony of his

8  suicide plans.  Per Dr. Anthony's March 8, 2007 group meeting notes, there was no risk of

9  suicide.  Instead, Dr. Anthony and the IDTT determined that plaintiff had a history of

10  exaggerating his symptoms for secondary gain, that additional therapy was unnecessary, that

11  plaintiff was not suitable for group treatment due to charges that involved safety issues with

12  supplies, and that plaintiff was deemed "historically a program failure."  See id., Ex. 5 (ECF No.

13  144-1 at 43).  Next, during plaintiff's one-on-one meeting with Dr. Anthony on April 25, 2007,

14  Dr. Anthony noted that plaintiff's suicide risk was "Minimal" and that he denied any episodes of

15  self harm, suicidal ideation, or violence to others.  See id., Ex. 10 (ECF No. 144-1 at 60).

16  Though she recorded plaintiff's "dread of life in prison" and "dread of dying," Dr. Anthony

17  believed that additional treatment was "inappropriate due to safety issues."  Id.

18          While there is no record of plaintiff's plan to overdose in these mental health

19  notes, the court will assume for purposes of this motion that plaintiff did express this plan to Dr.

20  Anthony.  But even assuming that he did, plaintiff fails to show that her response was

21  unreasonable in light of all the circumstances.  See Farmer, 511 U.S. at 844-45.  Accepting the

22  facts (as opposed to the conclusory allegations[9]) in plaintiff's declaration as true, and drawing all

23  reasonable inferences in his favor, Dr. Anthony found plaintiff not to pose a genuine suicide risk

24  _____

25          [9]  The court accepts for purposes of analysis that plaintiff felt suicidal and reported his
   suicidal thoughts to Dr. Anthony, but does not assume the truth of his unsupported allegations
   that she deliberately falsified his treatment records or his conclusory allegations regarding her

26  state of mind.

20

1   or to require EEOP placement *despite* his reports of suicidal intent.  Given the mental health

2   records available to Dr. Anthony[10], especially the prior conclusions of prison mental health

3   providers that plaintiff did not pose a suicide risk, was manipulative and exaggerated his

4   symptoms, her failure to identify and treat a psychiatric emergency cannot constitute deliberate

5   indifference.  Even if past evaluations had been inaccurate, and/or if Dr. Anthony was wrong in

6   her conclusion that plaintiff did not require EEOP placement or emergency treatment, no

7   reasonable trier of fact could find a mental state more culpable than negligence on these facts.

8   Neither negligence, recklessness, nor medical malpractice rises to the level of deliberate

9   indifference.  Id. at 835-37; Estelle, 429 U.S. at 104.  Difference of opinion between a prisoner

10  and a medical professional over the appropriate treatment does not constitute an Eighth

11  Amendment violation.  Franklin v. State of Or., State Welfare Div., 662 F.2d 1337, 1344 (9th

12  Cir. 1981).  On the facts of this case, no rational trier of fact could find for plaintiff.

13        Plaintiff also contends that Dr. Anthony conspired with Dr. Powell to minimize

14  the extent of plaintiff's verbal statements regarding his mental health needs, in retaliation for

15  plaintiff's filing of complaints against MCSP staff.  Plaintiff's TAC and his opposition to the

16  instant motion, however, are completely devoid of any factual allegations or evidence that Dr.

17  Anthony and Dr. Powell had an agreement or "meeting of the minds" to conspire to violate

18  plaintiff's constitutional rights.  See Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621,

19  626 (9th Cir. 1988).  There is no evidence that Dr. Anthony was even aware of plaintiff's filing

20  of grievances against MCSP staff.  Moreover, while the record establishes that plaintiff met with

21  Dr. Anthony four times, he was seen five other times by over ten different mental health

22

23        [10]  As detailed above, this record establishes that plaintiff was seen multiple times by
      many mental health professionals both before and during his September 2006 bacterial infection.
24    The mental health notes prepared at each of these meetings are consistent with the mental health
      notes prepared by Dr. Anthony.  That is, plaintiff had been described as anxious and depressed
25    even before his September 2006 bacterial infection; he was repeatedly noted to deny suicidal
      ideations; he was described at various times as manipulative, calm, and cooperative; he was
26    noted to lack any outward signs of distress or psychosis; and, finally, his depression was deemed
      "mild" and "situational."

1  professionals upon his return from Kentfield Hospital, none of whom documented any mental

2  health issues beyond what Dr. Anthony documented.  Indeed, as discussed supra, their notes

3  mirror Dr. Anthony's notes regarding plaintiff's mental state.  Plaintiff, however does not accuse

4  these individuals of conspiring with Dr. Powell to falsify their notes.  Because plaintiff presents

5  no evidence in support of this claim, plaintiff's allegation amounts to the type of "speculation or

6  unfounded accusation" that warrants summary judgment.  See Carmen, 237 F.3d at 1028.

7        Finally, it is without dispute that plaintiff has not suffered any cognizable harm to

8  support his claim for compensatory damages.  Per plaintiff, Dr. Anthony's failure to place him in

9  EEOP resulted in plaintiff's "suicidal preparations" on two occasions.  In other words, plaintiff

10  claims that defendant's conduct led plaintiff to *prepare* to attempt suicide, first by possessing a

11  razor blade and then by purchasing heroin, but his efforts were thwarted each time when both the

12  razor blades and the heroin were confiscated from him.[11]  Plaintiff thus never actually attempted

13  suicide.  Based on his own declaration, plaintiff suffered only mental anguish as a result of

14  defendant's allegedly unconstitutional conduct; he did not suffer physical injury.

15        The Prison Litigation Reform Act bars plaintiff from compensatory damages for

16  an alleged mental or emotional injury without a showing of physical injury, at least in the Eighth

17  Amendment context.

18           No federal civil action may be brought by a prisoner confined in
             jail, prison, or other correctional facility, for mental or emotional
19           injury suffered while in custody without a prior showing of
             physical injury.
20

21  42 U.S.C. § 1997e(e).  The physical injury "need not be significant but must be more than de

22  minimis."  Oliver v. Keller, 289 F.3d 623, 627 (9th Cir. 2002).  Here, plaintiff has not alleged or

23  shown any physical injury, let alone de minimus injury, in connection with Dr. Anthony's

24  alleged failure to place plaintiff in the EEOP program.  Accordingly, plaintiff's claim for

25

26        [11] See supra n. 8.

22

1  compensatory damages against Dr. Anthony is barred.[12]

2  C.      Plaintiff's Request for Appointment of Counsel

3            In his opposition, plaintiff repeats his request for the appointment of counsel.

4  Plaintiff's previous three requests were denied.  See ECF No. 141.  Because plaintiff again fails

5  to present new facts or circumstances warranting the appointment of counsel, this request will be

6  denied.

7            Accordingly, IT IS HEREBY ORDERED that plaintiff's request for appointment

8  of counsel is denied; and

9            IT IS HEREBY RECOMMENDED that defendant Anthony's October 23, 2012

10 motion for summary judgment be granted.

11           These findings and recommendations are submitted to the United States District

12 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

13 eight days after being served with these findings and recommendations, any party may file

14 written objections with the court and serve a copy on all parties.  Such a document should be

15 captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

16 objections shall be served and filed within fourteen days after service of the objections.  The

17 parties are advised that failure to file objections within the specified time may waive the right to

18 appeal the District Courts order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19 DATED: April 4, 2013.

20

21                                    _____
                                     ALLISON CLAIRE
22                                    UNITED STATES MAGISTRATE JUDGE

23 /mb;rodr1028.msj. anthony

24

─────────────────────────

25      [12]  Although plaintiff's compensatory damages claim fails, absent summary judgment for
   defendant he would not have been barred from seeking nominal or punitive damages.  See
26 Oliver, 289 F.2d at 629-30.